## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.:1:09-cr-00554-JTC-1 |
| | ) | |
| JEFFREY L. LEVINE, | ) | |
| DEFENDANT. | ) | |
| | ) | |
| | ) | |
| | ) | |

### Defendant Jeffrey Levine's Motion To Add An Additional Letter of Support to His Motion for Mitigation of Sentence

The defendant, Jeffrey Levine, moves to add the attached letter to his previously filed Motion in Mitigation of his Sentence filed on or about January 16, 2011, showing unto the Court as follows:

The letter attached from Harvey Kopelowitz did not arrive in time to be attached to the previous memorandum filed electronically on or about January 16, 2011. It is important because it gives a background about "hard money" lending which is helpful in considering the facts of the above-referenced case.

Respectfully submitted,

/s/C. Michael Abbott
C. MICHAEL ABBOTT
Ga. Bar No.: 000250

C. Michael Abbott, P.C.
1401 Peachtree Street
Atlanta, GA 30309
Tel: 404 262 6510
Fax: 404 261 2842
E:  michael@michaelabbottlaw.com

LAW OFFICES OF
_____ **HARVEY KOPELOWITZ, P.A.** _____

**8059 VALHALLA DRIVE**                                           **561-239-8800**
**DELRAY BEACH, FLORIDA 33446**                    HKOPELOWITZ@KOLAWYERS.COM

February 1, 2011

Michael Abbott, Esq.
1401 Peachtree Street, Suite 500
Atlanta, Georgia 30309
michael@abbottlaw.com

                    RE:   **Omni Redevelopment / Jeffrey Levine**

Dear Mr. Abbott:

This letter is written in connection with the proceedings involving Jeff Levine and his involvement as an officer with Omni Redevelopment.

Jeff and I in addition to being friends since college, were reacquainted on or about the year 2000, when we discovered that we were both presidents of competing "hard money lender" companies, both specializing in the financing of the acquisition and redevelopment of moderate to low-priced single-family homes. Jeff, as the President of Omni Redevelopment, and I as President of LendingOne.

Jeff has asked me to review certain policies and procedures which Omni employed and to comment on whether such policies and practices were consistent with this niche industry.

By way of background and to demonstrate why I feel particularly qualified to offer a response deserving of your attention, please review the following:

1)     Although LendingOne was not bank-owned and therefore, not directly regulated by the same laws as was Omni, LendingOne's investors were all banks. Thus, LendingOne, as the originator and servicer for 1000's of bank-owned loans, was sensitive to the underwriting and other policies and practices affecting Omni and, operated in a manner consistent with many of these policies and practices.

2)     Omni had made an offer to purchase LendingOne during my tenure as President. As a result, I had frequent conversations with its Management personnel and was invited to attend an Omni Board Meeting, where both companies shared confidential information regarding their respective policies and practices. It was generally recognized that our policies and practices mirrored one another's.

3)     As a competitor of Omni's in many markets, we were familiar with the loan products which Omni offered and, from time-to-time, would design our products to be consistent with or to compete favorably with those of Omni's. These included the structuring of underwriting requirements, placing caps on loan exposure, and other matters which affected risk but allowed us to be competitive.

                                    **PAGE 1**

Given the above background and my familiarity with this niche industry, I wish to discuss the following matters which Jeff has asked me to comment upon.

## 100% Financing vs. 20% Down-Payment As A Requirement

"Hard Money" loans such as those offered by Omni and LendingOne, are typically underwritten based on a percentage – 65% would not be uncommon - of the "after-repaired value" of the property. Thus, a property which might be purchased for $50K but worth $100K when repaired, would underwrite for a loan of $65K. A borrower seeking to finance this purchase would therefore, routinely receive a loan of $65K on a $50K purchase or, financing of 100% of the purchase price. (The balance of the loan proceeds would go towards closing costs and repair costs). It was common-place that a hard money loan would result in 100% financing of the purchase. I am not aware of any hard money lenders requiring a 20% down payment.

## Creditworthiness of Borrower

"Hard money" borrowers typically had some form of credit problem or weakness or other challenge to the transaction, or else they would be seeking less expensive conventional financing rather than "hard money" loans. "Hard money" loans therefore, are typically underwritten based upon the asset rather than the creditworthiness of the borrower. The creditworthiness of the borrower is secondary, as there is generally no practical benefit to pursuing collection against the borrower once the property is secured. It is therefore common place to do minimal underwriting on the borrower, focusing instead on the condition of the property through initial inspections. Then estimating the cost to repair and determining the current and "as repaired" values, through independent appraisals of the property. A credit report on the borrower and name search (as part of the title review) and little else would typically be accumulated. At LendingOne, we did a more extensive credit review where a borrower was seeking multiple loans, but generally, provided a borrower met the minimum credit score requirements, and had a decent credit history as reflected upon their credit report, they were considered credit worthy.

## Multiple Loans to One Borrower

Generally we found that the better borrowers tended to have more than one loan outstanding. While we placed a limit on the maximum exposure which we would have outstanding with a single borrower, many of our customers had more than one loan outstanding from time-to-time.

## Loans Through Wholesalers

While we preferred to deal with the borrowers directly often, and especially in the more urban markets, there were wholesalers who had the better properties tied-up. It was not uncommon in such markets therefore, to have a wholesaler paid the equivalent of an assignment fee from the proceeds of a loan. So long as the loan amount was within the underwriting guidelines for that loan, typically 65% to 70% LTV, we did not object to the payment of consideration to a wholesaler.

## Using Construction Monies to Pay Interest

We required that loans be current as a condition to repair monies being advanced from the monies escrowed for repair costs. Therefore, we routinely would deduct interest owed to us from the escrowed repair moneys as and when draw requests were funded. The net effect to the borrower was the same because if there was a resultant shortage of funds for repairs they would have to pay this shortfall with their own funds.

PAGE 2

Likewise, if loans were in default, our loan documents provided that escrowed repair monies could be applied against these loan balances.

**Financing REO's**

Industry policies and practices employed to advance the sale of REO's were of necessity, often different from those employed with other loan originations. We often would employ more liberal underwriting practices in order to sell an REO. For example, whereas we might typically loan at 65%-70% LTV, loans made on REO's could go to up to 100% LTV if for example, the repair costs justified such a loan amount. We would also reduce or suspend interest payments on REO loans. Whatever deals had to be made would be made when it came to selling REO's since nothing was worse than continuing to own these REO's. We also felt a responsibility to the community to resell these properties, since REO's could deteriorate to become drug havens, further diminishing the value of this and neighboring properties and increasing crime.

**Loan Extensions**

If a loan was past maturity and a borrower was willing to keep the loan current, we would typically agree to extend the loan. Never did we require that an extended loan be amortized. We would be more likely to reduce the interest payments than make it more burdensome on the borrower.

I hope this has been of some benefit in explaining that the policies and practices employed by Omni were consistent with industry practices for this niche industry.

Very truly yours,

**HARVEY KOPELOWITZ, P.A.**

Harvey Kopelowitz

**PAGE 3**

## CERTIFICATE OF SERVICE

This is to certify that I have this 21st day of April served a copy of the foregoing

**Defendant Jeffrey Levine's Motion To Add An Additional Letter of Support**

**to His Motion for Mitigation of Sentence** by electronically filing this motion

using the CM/ECF system which will send notification of this filing to all counsel

of record.

/s/ C. Michael Abbott